LOUISVILLE AND NASHVILLE RAIL-ROAD CO., Plaintiff-Appellee,

v.

MEAD JOHNSON & CO., Defendant-Appellant,

and

SOUTHERN RAILWAY COMPANY, Plaintiff-Appellee,

v.

MEAD JOHNSON & CO., Defendant-Appellant.

No. 83–1638.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1984.

Decided June 20, 1984.*

Certiorari Denied Nov. 5, 1984. See 105 S.Ct. 386.

* Pursuant to Circuit Rule 16(e), this opinion has been circulated among all judges of this court in

regular active service. No member of the court favored a rehearing en banc regarding the avail-

ability of the misrouting defense for inconsistent rate and route information in the circumstances of this case and the disagreement with

*Johnson Machine Works, Inc. v. Chicago, Burlington & Quincy Railroad Co.,* 297 F.2d 793, 798–99 (8th Cir.1962).

Paul J. Wallace, Bowers, Harrison, Kent & Miller, Evansville, Ind., for plaintiff-appellee.

Thomas H. Bryan, Fine, Hatfield, Sparrenberger & Fine, Evansville, Ind., for defendant-appellant.

Before CUMMINGS, Chief Judge, and PELL and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

Interstate common carriers are required by law to charge their shippers the lawful published tariff for a shipment, 49 U.S.C. § 10761(a), and this rule applies even where the carrier misquotes the applicable tariff to the shipper. This appeal presents issues concerning the vitality of this rule and the scope of the "misrouting" exception to it.

The dispute before us concerns freight charges for approximately 400 rail shipments of "milk food liquid" by defendant Mead Johnson & Co. from its plant in Evansville, Indiana, to its warehouse in South Plainfield, New Jersey. The shipments in dispute were made between 1978 and 1980 through the plaintiffs, Louisville & Nashville Railroad Company ("L & N") and the Southern Railway Company ("Southern").

Prior to 1977, Mead Johnson shipped milk food product from Evansville to New Jersey via Chicago and Buffalo. We shall refer to that route as the "northern route." Along the northern route, L & N took the goods to Chicago, and other lines carried them to Buffalo and on to Mead Johnson's plant in New Jersey. During late 1976 and early 1977, several shipments along this northern route were delayed, and the milk products were damaged by freezing. Representatives of L & N and Mead Johnson met to discuss the problems, and they agreed that Mead Johnson would begin to ship to New Jersey via Cincinnati, Ohio, and Hagerstown, Maryland. We shall re- fer to that route as the "southern route." At approximately the same time, Mead Johnson began to make some of its shipments to New Jersey on Southern, and those shipments also went along this southern route. All of the shipments in dispute here were made along the southern route.

The problem stems from the fact that the freight tariffs for the southern route differed from those for the northern route. The northern route had an approved commodity "rate tariff" under which the several carriers along the route had agreed in advance how to divide the revenues from the shipments they shared. The southern route did not have an approved "rate tariff," so charges for shipments along the southern route should have been the sum of the "route tariffs" for the various segments or legs of the southern route. The applicable route tariff for the southern route was, therefore, higher than the rate tariff for the northern route. Both railroads in this case charged Mead Johnson the lower rate applicable to shipments along the northern route (with its approved rate tariff), when by law the applicable tariff was the higher route tariff for the southern route.[1] The railroads later sued for the difference between the rates, totalling approximately $113,000 for the 400 shipments. After a consolidated trial before a magistrate, the railroads won judgments for the full amounts of the undercharges.

I.

■ Ancient and exotic laws govern interstate freight charges. A common carrier regulated by the Interstate Commerce Commission may not receive for its services any compensation other than that specified in the applicable tariff, "whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another

---

1. The district court described the correct tariff here as "apparently as hard to find as the Holy Grail." This court, after examining the tariffs included in the appellate record, entirely agrees.

device." 49 U.S.C. § 10761(a).[2] This rule is applied strictly:

> Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

*Louisville & Nashville Railroad Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). The shipper and the carrier may not agree on any other rate, and if the carrier by mistake charges the shipper at a rate lower than the applicable tariff, the carrier not only may but must sue to recover the difference. *Consolidated Freightways Corp. v. Forty-Eight Insulations, Inc.*, 501 F.2d 1400, 1402 (7th Cir. 1974). That rule applies even if the carrier misquotes the applicable rate to the shipper. "The carrier's right to recover is quite unaffected by the usual limitations on contract actions based on mistake." *Western Transportation Co. v. Wilson & Co., Inc.*, 682 F.2d 1227, 1229 (7th Cir.1982). *See also Aero Trucking, Inc. v. Regal Tube Co.*, 594 F.2d 619, 622 (7th Cir.1979) (shipper's alleged reliance on misquoted rates not a defense). The reason for this unusual rule, with its sometimes inescapably inequitable results, was Congress' desire to eliminate the secret discounts and preferential treatment for big shippers that were common in the late 19th century. *Id.*, 594 F.2d at 621.

■ Ordinarily the carrier would be able to recover the rate differences merely by showing, as the railroads here have done, that the applicable filed tariff was higher than the amount actually charged. However, the courts and the ICC have recognized a narrow exception to the sometimes harsh rule that the filed tariff must apply regardless of mistake. Recovery may be denied if the carrier has "misrouted" the shipment. For example, if a shipper asks a carrier to take a shipment from Endsville to Mudville and does not specify the route between the two, the carrier ordinarily may charge only the lowest available rate between the two towns, even if the shipment actually went over a route carrying a higher tariff. Under those circumstances, the carrier generally has a duty to ship by the cheapest reasonable means available. *Northern Pacific Railway Co. v. Solum*, 247 U.S. 477, 483, 38 S.Ct. 550, 553, 62 L.Ed. 1221 (1918); *Johnson Machine Works, Inc. v. Chicago, Burlington & Quincy Railroad Co.*, 297 F.2d 793, 795 (8th Cir.1962). *See also Hewitt-Robins Inc. v. Eastern Freight-Ways, Inc.*, 371 U.S. 84, 87, 83 S.Ct. 157, 159, 9 L.Ed.2d 142 (1962) (recognizing shipper's cause of action for misrouting).

■ Mead Johnson has sought to show that the railroads "misrouted" the shipments here by sending them along the more expensive southern route. However, Mead Johnson faces one very formidable obstacle in making that argument. Mead Johnson itself prepared the bills of lading for the shipments here, and those bills of lading all contained route information which specified the southern route. Because Mead Johnson specified the route on the bills of lading, the railroads appear to have simply followed the shipper's instructions by using the southern route, and that cannot be misrouting.

Mead Johnson's rebuttal is two-pronged. It contends first that it included routing information in the bills of lading at the railroads' request and as a courtesy to them. Second, it contends that it always

---

**2.** The Interstate Commerce Act was revised and recodified in 1978 by Pub.L. 95–473, 92 Stat. 1337, *codified in* 49 U.S.C. §§ 10101 *et seq.* Section 10761(a) does not differ from prior statutes in any way relevant to this case.

made clear to the railroads that it wanted its products carried by the cheapest route.

Mead Johnson's rate clerk, Marilyn Scales, testified that railroad employees had repeatedly asked that Mead Johnson include the route information on the bills of lading. If this were true, Mead Johnson could have shown that the railroads were responsible for choosing the more expensive route and thus might have misrouted the goods. *See Texas Eastern Transmission Corp. v. Louisville & Nashville Railroad Co.*, 292 I.C.C. 15, 16 (1954) (shipper rebutted presumption that it designated route on bill of lading); *Sieck & Snediger v. Atchison, Topeka & Santa Fe Railway Co.*, 283 I.C.C. 337, 340 (1951) (same); *Brownyard v. Union Pacific Railroad Co.*, 148 I.C.C. 444, 448 (1928) (same). However, there is virtually no documentary support for Scales' contention, for according to Mead Johnson, the relevant documents would have been destroyed under Mead Johnson's document retention policy well before the case was brought. The magistrate who heard the case below did not credit Scales' testimony on this point, and he found that Mead Johnson itself had supplied the routing information. In the complete absence of any undisputed documentary support for Scales' testimony, we cannot say that this factual finding was clearly erroneous. Because Mead Johnson did not establish as a fact that the railroads supplied the route information, we need not decide whether misrouting can be found where the carrier supplies the route information but the shipper is aware of the route. *See infra* note 4.

In Mead Johnson's second line of attack, it insists it repeatedly told the railroads that it did not care which route the goods took, so long as they went by the cheapest route available. According to Mead Johnson, the fact that the bill of lading specifies the route is not conclusive but creates only a presumption that the shipper designated the route, and that presumption may be overcome by "the clear indication on the part of the shipper expressed to the carrier that his principal concern is the rate, not the route." *Johnson Machine Works, su-*

*pra*, 297 F.2d at 798. *See Brownyard v. Union Pacific Railroad Co., supra,* 148 I.C.C. at 448 ("clear evidence to the contrary" may rebut presumption).

Scales' testimony also supported this claim of "rate preference." She testified that in discussions with L & N leading to the use of the southern route, she and other Mead Johnson employees repeatedly told L & N that the southern route would be acceptable only if the same commodity rate could be preserved. According to her, Mead Johnson was not overly concerned about the delays and damage by freezing occurring on the northern route because Mead Johnson was receiving full compensation on its claims resulting from those problems. She also testified that in discussions with Southern Railway, Mead Johnson had insisted that it would ship with Southern only if the railroad could assure the same low rate that L & N was charging. According to Scales, representatives of both railroads assured her that the cheaper rate was available on the southern route. Again, her testimony on these points was not supported by any documentary evidence, with the exception of one brief handwritten note about a telephone conversation. According to Mead Johnson, the documents which would support her testimony on this point would also have been destroyed several years ago. The railroads both said that searches of their files did not turn up any of this alleged correspondence.

The magistrate who heard the case in the district court found that the presumption of shipper routing had not been rebutted by clear evidence to the contrary. He wrote that he was "unable to find a preponderance of the credible evidence supporting the proposition that the shipper's only concern was shipping by the lowest rate or that such concern was duly impressed or communicated to the carriers." Those findings are grounded on the documentary evidence in the record, and the evaluation of the rate clerk's unsupported testimony is a task for the magistrate in the first instance. We cannot say that his findings

were clearly erroneous. Therefore, we need not decide whether a shipper's clear expression of rate preference can establish misrouting where the shipper is aware of the route. *See infra* note 4.

## II.

Mead Johnson argues finally that even if it supplied the routing information, the railroads still misrouted the shipments because they received from Mead Johnson ambiguous or inconsistent route information which they had a duty to clarify. It is clear that Mead Johnson was doing most of the railroads' paperwork on these shipments, including preparing the bills of lading and calculating the applicable tariffs. Scales, the rate clerk who testified for Mead Johnson, maintained "rate charts" which specified the applicable tariffs for Mead Johnson's shipments of various products from Evansville to points around the country. The rate charts would have saved a great deal of time in calculating the applicable tariffs on repeated shipments.

These rate charts were not only for Mead Johnson's convenience. According to Scales, she delivered these rate charts to both railroads and regularly updated the charts. In fact, when new rates were about to go into effect, the clerks at both railroads called her to find out if she had figured out the new tariffs for them. The railroads relied on Mead Johnson's rate charts to such an extent that the magistrate found that all of the freight bills in this case were based on these rate charts. The railroads would prepare the freight bills merely by comparing the bills of lading, which Mead Johnson prepared, with the rate charts, which Mead Johnson also prepared.

Mead Johnson argues that where a shipper provides both route and rate information, and where that information is ambiguous or contradictory, the carrier has a duty to inquire and clarify whether the shipper prefers the rate or the route specified on the shipping papers. Mead Johnson relies on *Johnson Machine Works, Inc. v. Chicago, Burlington & Quincy Railroad Co.*, 297 F.2d 793, 798 (8th Cir.1962), which held that where a shipper designated a route and clearly indicated that it claimed a transit rate not applicable to that route, the carrier had a duty to resolve the ambiguity by asking the shipper to choose between the designated route and the claimed rate. There the court reasoned that the shipper's designation of a rate not applicable to the specified route implied the designation of a second and alternative route. The court relied on several ICC decisions holding that the carrier has a duty to clarify ambiguous or inconsistent instructions.[3] Where the carrier breached that duty, it could charge only the tariff for the cheaper of the two routes thus designated. 297 F.2d at 798–99.

The railroads argue that *Johnson Machine Works* should not apply here because in that case the inconsistent rate and route information were both contained on the same document—the bill of lading. However, it is clear that the court in *Johnson Machine Works* did not rely on that fact, and we do not think that circumstance is controlling—or perhaps even relevant—here. The significant fact in *Johnson Machine Works* was that the shipper had designated a route and at the same time clearly indicated "on the shipping papers" that it was claiming a transit rate which was available between the origin and destination but not applicable to the designated route. 297 F.2d at 798. In the present case the shipping papers themselves did not indicate the rate which Mead Johnson claimed was applicable, but the rate charts provided by Mead Johnson and used by the railroads in preparing the bills indicated as clearly as possible which rates Mead Johnson claimed. This situation thus appears to be parallel to that in *Johnson Machine Works*, for it should have been clear to the

3. *See, e.g., Vernon Lumber Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 281 I.C.C. 789, 791 (1951); *Inland Steel Co. v. Union Pacific R. Co.*, 264 I.C.C. 267, 269 (1946); *Cudahy Packing Co. v. Baltimore & Ohio R. Co.*, 173 I.C.C. 121, 124 (1931).

railroads that Mead Johnson was providing inconsistent rate and route information.

The railroads argue additionally that application of the *Johnson Machine Works* exception for contradictory information could provide a device for circumventing the clear terms of 49 U.S.C. § 10761(a). We are not persuaded that the exception for inconsistent information would undermine the purposes of the act, at least as the exception would be applied in the circumstances of this case. Mead Johnson claimed on its rate charts a rate that clearly was available between the origin and destination. Indeed, if Mead Johnson had not supplied the route on the bills of lading, it is quite possible that it could have been charged only the lower rate, regardless of which route the goods actually followed. Since in any event the lower rate could have been available, the case before us presents no immediate threat of unlawful rate preferences.

Nonetheless, although the *Johnson Machine Works* exception for inconsistent rate and route information does not appear to undermine the purpose of the statute, it does appear to conflict with the applicable Supreme Court decisions which apply the terms of the Act strictly and apparently beyond the requirements of its underlying purpose. The Court has held that shippers are conclusively presumed to know the filed tariffs applicable to their shipments. *Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink,* 250 U.S. 577, 581, 40 S.Ct. 27, 27, 63 L.Ed. 1151 (1919); *Louisville & Nashville Railroad Co. v. Maxwell,* 237 U.S. 94, 97–98, 35 S.Ct. 494, 495–496, 59 L.Ed. 853 (1915); *Kansas City Southern Railway Co. v. Carl,* 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913). *See also Aero Trucking, Inc. v. Regal Tube Co., supra,* 594 F.2d at 621–22. The Court has also said that no equitable defenses can prevent enforcement of the lawful rates, and that no act or omission by the carrier, except for the running of the statute of limitations, can prevent enforcement of the lawful tariffs. *Louisville & Nashville Railroad Co. v. Central Iron & Coal Co.,* 265 U.S. 59, 65, 44 S.Ct. 441, 442,

68 L.Ed. 900 (1924). *See Baldwin v. Scott County Milling Co.,* 307 U.S. 478, 485, 59 S.Ct. 943, 948, 83 L.Ed. 1409 (1939) (equitable considerations not a defense); *Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink,* 250 U.S. 577, 582–83, 40 S.Ct. 27, 28, 63 L.Ed. 1151 (1919). These decisions remain good law. Congress has not amended the Interstate Commerce Act to change the rigid enforcement of tariffs, and the Supreme Court has consistently adhered to these precedents and to the Act's original dominant purpose of precluding under any guise preferential treatment in interstate freight rates. *See Southern Pacific Transportation Co. v. Commercial Metals Corp.,* 456 U.S. 336, 343–44, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982).

The exception for inconsistent rate and route information therefore appears to conflict with the conclusive presumption that the shipper knows the lawful tariff. Where the shipper provides a route to the carrier and at the same time claims a rate which is not lawfully applicable to that route, the presumption of the shipper's knowledge would seem logically to preclude a claim of misrouting.

We can see no credible way to distinguish the situation of inconsistent rate and route information from one in which both parties agree on a rate other than the lawful rate, regardless of whether the parties are aware of their mistake. It is clear that Mead Johnson and both railroads thought that the lower commodity rate tariff applied to the southern route, and it is clear that all parties were wrong on that score. This circumstance appears to be nothing more than a mutual mistake or misquotation, and the shipper remains liable for the lawful tariff. *Louisville & Nashville Railroad Co. v. Maxwell,* 237 U.S. 94, 98, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Mead Johnson's argument regarding inconsistent information has a powerful appeal to equity, but this contention would also seem to apply to any case in which the carrier had juxtaposed the route and incor-

rect rate information received from the shipper. A broadly defined "inconsistency" exception would quickly swallow the rule that mistake is not a defense in interstate rate cases, for a shipper could protect itself by merely telling the carrier which rate it was claiming. The Supreme Court said in *Maxwell, supra:*

> A misstatement or misquotation of the rate over a given route is one thing; misrouting is a different matter. We do not think that it can be said that there is a "misrouting," in any proper sense, when the route given by the company is that requested by the shipper or passenger.

237 U.S. at 99, 35 S.Ct. at 496. We think the exception for inconsistent or ambiguous information must therefore be limited to situations in which the carrier cannot understand the shipper's routing instructions, or where the routing instructions, *without reference to rate information,* cannot be executed as written.[4] Under this view therefore there was no misrouting here.

We recognize the apparent unfairness of this strange result. This construction of the Interstate Commerce Act encourages shippers to be lazy. Mead Johnson is being penalized here for being a knowledgeable shipper who went the extra mile by helping the railroads do their own jobs. However, Congress, in fear of the perhaps now dated bogeyman of rate discrimination, has established a regime of strict adherence to interstate freight tariffs. And the Supreme Court decisions show that the Act is to be enforced rigorously according to its terms.

To ensure the achievement of the Act's purposes, the terms in which the Act is framed reach well beyond those purposes. Although the courts have frequently recognized the harshness and absurdity that may result from the strict construction of the Act, Congress has not amended it. The wisdom of the Act's policy of insisting first and foremost upon uniformity of interstate freight rates is not before us,[5] and we are obliged to enforce the Act as written by Congress and interpreted by the Supreme Court.

For the foregoing reasons, the judgments of the district court in favor of plaintiffs Louisville & Nashville Railroad Company and Southern Railway Company are

AFFIRMED.

---

4. Our reasoning here, based on the presumption that the shipper knows the applicable tariff, would appear to extend to situations in which the shipper is aware of the actual route prior to shipping. If it does extend that far, it would call into question the validity of the misrouting exception where the carrier provides the routing information. *Cf. Brownyard v. Union Pacific R. Co.,* 148 I.C.C. 444, 448 (1928). Because Mead Johnson failed to establish as a factual matter that the railroads supplied the routing information, *see supra* Part I, we need not decide whether the misrouting exception is available where the carrier supplies routing information and the shipper is aware of the route.

5. Recent legislation moving toward modified deregulation of the railroad industry (involving greater reliance on competitive forces) might suggest the need for a second look at policies requiring strict adherence to filed tariffs. *See, e.g.,* Staggers Rail Act of 1980, Pub.L. 96–448, 94 Stat. 1895; Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, 90 Stat. 31. Greater rate flexibility, for example, might seem appropriate where competitive forces are at work and monopoly or monopsony power has abated. However, Congress has not yet amended the Act to permit greater flexibility in situations like the one before us, and we are unwilling to engage in deregulation by adjudication.