614 F.Supp. 1355 (1985)
INMAN FREIGHT SYSTEMS, INC., Jim S. Green, Trustee, Plaintiffs,
v.
OLIN CORPORATION, Defendant.
No. 84-1182 C (5).
United States District Court, E.D. Missouri, E.D.
June 28, 1985.
*1356 Steven Weiss, Ronald M. Hill, Chicago, Ill., and Richard L. Geissal, Jr., St. Louis, Mo., for plaintiffs.
Joseph H. Mueller, St. Louis, Mo., and Ross L. Thorfinnson, Hopkins, Minn., for defendant.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
This court-tried case involves a dispute between a carrier and the consignee (i.e. recipient of the shipments) over undercharges of shipments of projectile parts and radioactive material.
This Court has personal jurisdiction of the parties and subject jurisdiction of the cause of action pursuant to the Revised Interstate Commerce Act, 49 U.S.C. § 10101 et seq.
Plaintiff carrier is the trustee in bankruptcy of Inman Freight Systems, Inc., a Missouri domestic corporation which was adjudicated a bankrupt on December 8, 1981. All references hereinafter to plaintiff shall be deemed to include the trustee or Inman Freight Systems, Inc., as the context may require.
At all relevant times, plaintiff was a motor carrier operating pursuant to authority issued by the Interstate Commerce Commission (ICC), and defendant Olin Corporation was a corporation existing under the laws of the State of Virginia and doing business in both Illinois and Missouri. Wintz Motor Freights, Inc., was a motor carrier operating pursuant to authority issued by the ICC.
*1357 Honeywell, Inc., and defendant were consignor and consignee, respectively, on a contract covering the delivery of the subject shipments.
The problem arises from the transportation by Wintz and plaintiff, for Honeywell, of shipments of freight, between September 4, 1980 and June 22, 1981. These shipments were tendered by Honeywell to Wintz at New Brighton, Minnesota for delivery to defendant in Marion, Illinois. Wintz interchanged all of the subject shipments with plaintiff in St. Louis, Missouri. Plaintiff completed the delivery to defendant in Marion, Illinois.
All the shipments were shipped by Honeywell as consignor (and defendant as consignee) on prepaid bills of lading showing a routing by Wintz. Wintz billed Honeywell $100,401.82 for transporting the shipments and Honeywell prepaid that amount.
When plaintiff was declared bankrupt, an audit of its freight bills was conducted. The audit revealed the alleged undercharges for the Honeywell-Olin shipments. Plaintiff contends that the original rate applied was incorrect; the correct rate is the class rate published in ICC MWB 501 series. Defendant, however, argues that it is not liable for any undercharges because Wintz should have protected the low commodity rate by interchanging with another carrier in Chicago, instead of with plaintiff in St. Louis. Defendant further avers that Honeywell, pursuant to the contract between defendant and Honeywell, is liable for all freight charges.
The Middlewest Motor Freight Bureau Tariff 200-series (ICC MWB 200) established the commodity rate for freight shipments from New Brighton, Minnesota to Marion, Illinois. A commodity rate (which establishes freight charges from a specific origin to a specific destination) is normally lower than the class rate (the freight charges for general delivery). The commodity rate is a preferential rate and the court testimony indicates that the carrier is expected to route the shipment in order to preserve the commodity rate, if at all possible. The MWB 200 tariff was a publication for the benefit of several carriers who agreed to be a party to it. It contained a schedule of freight charges, applicable rules, and governing regulations. The MWB 200 tariff not only established the commodity rate, but also included routing instructions pursuant to the MWB 121 tariff. Another tariff, referred to as NMF 100-G, governed the MWB 200 series tariff with regard to the transportation of hazardous materials. It requires the movement of such shipments along the "shortest available route".
The testimony by the several expert witnesses was somewhat conflicting as to the application of certain regulations propounded by the ICC. The particular regulations in question appear to be 49 C.F.R. § 1300.64 and 49 C.F.R. § 1162.4(3). 49 C.F.R. § 1300.64 normally entitles the consignor to the benefit of the commodity rate. However, plaintiff's expert Mr. Byes (on direct) and defendant's expert Mr. Rubenstein (on cross) did agree that if the applicable tariff has routing instructions, then the tariff supercedes the C.F.R. Since the MWB 200 series tariff did have routing instructions, the Court finds that the MWB 200 series tariff governs.
The experts' next major dispute was whether another carrier, Associated Truck Lines (ATL), could have been used as the destination carrier in order to preserve the commodity rate. In order to preserve the commodity rate of MWB 200 for a joint route, both the origin and destination carriers must be a party to the tariff. Plaintiff was not a party to the tariff, while Wintz and ATL were both parties to the tariff.
Although ATL was a party to the MWB 200 series tariff, its ability to participate in a joint route with Wintz, during the relevant time period, was questionable. The Court finds that the criteria for a joint route is 1) the origin carrier must have authority to deliver to the transfer point; 2) the transfer/destination carrier must have authority to deliver to the final destination point; and 3) a bi-lateral concurrence *1358 (an interchange agreement) must be published by both carriers. The credible evidence supports a finding that ATL could not be a party to the joint route because it had permanent authority to serve both the origin and destination points and the bilateral concurrence (between ATL and Wintz) was published too late to preserve a commodity rate for the shipments.
The confusion as to ATL's capacity to participate in the joint route stemmed from its authority to serve St. Paul/Minneapolis. The parties vehemently differed as to the type of authority ATL had while serving St. Paul/Minneapolis. If it were temporary authority, then ATL could serve Marion, Illinois because its service to St. Paul/Minneapolis could not be "tacked on" to its service to Marion, thereby creating a direct route. Such "tacking on" is prohibited by 49 C.F.R. § 1162.4(3). However, if the authority is permanent, ATL would be prohibited from participating in a joint route under the MWB 200 series tariff because a carrier which serves both origin and destination cannot be a party to a joint route between the origin and destination.
The credible evidence supports this Court's finding that ATL had permanent authority to serve both origin and destination as of publication in April, 1981. Although ATL was serving St. Paul/Minneapolis before April, 1981, neither parties' experts could testify with certainty that ATL had permanent authority prior to the publication. Secondly, ATL and Wintz did not have a bilateral concurrence until it was published in November, 1980.
It appears then, to the Court, that Wintz could not have used ATL in order to preserve the commodity rate for the shipments prior to November, 1980 and after April, 1981. Furthermore, Wintz was under a duty to use the shortest available route because of the material being shipped. All the evidence and testimony concurred that the route through St. Louis was shorter than the route through Chicago.
The Court finds that the evidence is insufficient to support defendant's contention that plaintiff intentionally "misrouted" the shipments in order to avoid the lower commodity rate. Plaintiff could not have preserved the commodity rate by using ATL before November, 1980 and after April, 1981 because ATL was prohibited from participating in the joint route. As regards shipments between November, 1980 and April, 1981, the Court believes that plaintiff had an obligation to abide by the spirit and intent of the NMF 100-G tariff to consider safety foremost in routing the shipments of hazardous materials. It was necessary to sacrifice the commodity rate in order to move the shipments along the shortest available route.
Plaintiff contends that the class rate published in ICC MWB 501 series must apply to the subject shipments because MWB 501 is the only tariff published for the account of Wintz and plaintiff. The Court agrees with plaintiff and finds that the amount due and owing on the subject shipments is $150,885.28.
Defendant next argues that if this Court should find that plaintiff did not misroute the shipment, it still is not liable for the undercharges because the bills of lading from the consignor were marked "prepaid"; the freight charges were fully paid by Honeywell when submitted by Wintz; and the contract between Honeywell and defendant included the freight charges (per the bills of lading) which defendant fully paid. Defendant contends that these facts estop plaintiff from seeking to collect the undercharges from defendant.
Interstate common carriers are required by law to charge only the rate specified in the applicable published tariff, 49 U.S.C. § 10761(a), and this rule applies even if the carrier mistakenly charges a lower rate or misquotes the applicable tariff to the shipper. Louisville & Nashville R. Co. v. Mead Johnson & Co., 737 F.2d 683, 685-86 (7th C 1984); Western Transportation Co. v. Wilson & Co., 682 F.2d 1227, 1229 (7th C 1982). Thus, a carrier not only may, but must sue to recover the difference. If, by mistake, it charged a lower rate, the carrier must sue to recover *1359 the undercharge. Southern Pacific Transportation Co. v. Commercial Metals Co., 456 U.S. 336, 343, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982); Louisville & Nashville R.R. v. Central Iron & Coal Co., 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924); Louisville & Nashville R.R. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); Mead Johnson, at 686; Western Transp., 682 F.2d at 1229.
Plaintiff has a lawful obligation to sue for recovery of the undercharges, but the question still remains as to who is liable for payment of the undercharges.
Although the bills of lading are marked "prepaid" and this normally signifies payment of the freight charges by the shipper/consignor, such a factor does not relieve the consignee of its obligation to pay the freight charges when it accepts delivery of the shipment(s). Early decisions of the U.S. Supreme Court connote a strong unwillingness to recognize a consignee's estoppel defense. N.Y. Central & Hudson River Ry. v. York & Whitney Co., 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016 (1921); Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919). In Fink, the Court permitted the carrier to recover a $15.00 undercharge from the consignee because it reasoned that the consignee becomes "prima facie liable for the payment of the freight charges when he accepts the goods from the carrier." Id., at 581, 40 S.Ct. at 27. The court rejected the consignee's estoppel defense because to do otherwise would thwart the anti-discrimination purpose behind Section 10761 (Section 10761 codifies the prior section referred to as 49 U.S.C. § 6(7)). Id, at 583. The court clearly stated its reason for the rejection: "Estoppel could not become the means of successfully avoiding the requirement of [49 U.S.C. § 6(7)] as to equal rates...". Id., at 583, 40 S.Ct. at 28.
The Eighth Circuit has followed this strong inclination to disfavor the estoppel defense. In Central Warehouse Co. v. Chicago, R.I. & P. Ry., 20 F.2d 828 (8th C 1927), the bills of lading were mistakenly marked prepaid. When the plaintiff carrier found the shipper to be insolvent, it sought payment from the defendant consignee. The Eighth Circuit rejected defendant's estoppel defense because if the defendant escaped its obligation to pay the freight charges, then the carrier would not be fulfilling its duty to collect the lawful rate, thereby effecting a discrimination in violation of the Interstate Commerce Act. Id., at 829-830.
In 1972, the Eighth Circuit reviewed the Fink, York & Whitney, and Central Warehouse decisions as they applied to a "freight prepaid" case wherein the consignee has reimbursed the shipper for freight charges. In Southern Pacific Transportation Co. v. Campbell Soup Co., 455 F.2d 1219 (8th C 1972), the court held that where the carrier delivered to consignee under bills of lading marked prepaid, and the consignee, in reliance on the shipper's representation that it would pay the carrier, reimbursed the shipper for the full amount of freight charges, but the shipper did not pay the carrier, the consignee was entitled to the defense of estoppel in the carrier's suit to collect the freight charges.
In this case, defendant Olin relies heavily on Southern Pacific Transportation v. Campbell Soup to support its claim that it is not liable for the undercharges. A careful reading of Southern Pacific reveals that it is inapplicable to the present case.
The Southern Pacific court reached its decision based upon whether the estoppel defense, under the facts at hand, would contravene the anti-discriminatory purpose of § 6(7) [as already noted, § 6(7) has been codified by § 10764]. The Court simply reasoned that this would not be a conflict between recognition of the estoppel defense and the anti-discriminatory purpose of § 6(7) because the consignee had already paid the full freight charges to the shipper. The court found such a situation different from that present in the Fink and Central Warehouse cases, where the consignee had not paid the full freight charge. Southern Pacific Transportation v. Campbell Soup, at 1221. In 1982, the Eighth Circuit went *1360 even further in distinguishing between those cases such as Southern Pacific Transportation v Campbell Soup. ("freight prepaid" case) and "undercharge" cases. Missouri Pacific Railroad Co. v. Rutledge Oil Co., 669 F.2d 557 (8th C 1982). In Missouri Pacific, the court found that the unpaid demurrage charges case-at-hand "resembles those involving the misquotation of rates and subsequent undercharge in which courts have consistently refused to recognize estoppel defenses." Id, at 559. The Eighth Circuit reasoned that in such cases, estoppel would result in a rate preference. Id, at 559. The Eighth Circuit affirmed the district court's rejection of the estoppel defense.
The anti-discrimination provision of § 19764 is steadfastly protected by the courts and generally recognition of the estoppel defense has been a rare exception. A suit to recover freight undercharges does not constitute a rare exception. Although defendant has paid the freight charges as provided by the bills of lading, it has not been relieved of its duty to pay the full freight charges. The "full" freight charges are those proscribed by the applicable lawful tariff. Even though plaintiff was mistaken in its calculation of the original freight charges, defendant still is obligated to make up the difference in rate charges. To estop plaintiff from seeking to recover the lawful rate, would be to allow freight rate discrimination.
Defendant's argument that its contract with Honeywell relieves its obligation to pay the undercharges appears to be irrelevant. The validity and effect of that contract is not what is at issue before this Court. Defendant's liability for the undercharges is a matter of law. Once defendant accepted the shipments, it became liable for freight charges under the applicable lawful tariff. Whether or not defendant has the right to seek reimbursement from Honeywell is another matter.
Plaintiff is under a duty to recover the undercharges. Defendant is obligated to pay the full freight charges upon receipt of the shipments. Since only a portion of the freight charges were paid pursuant to the prepaid bills of lading, defendant is liable for the remainder.