INMAN FREIGHT SYSTEMS, INC. and
Jim S. Green, Trustee, Appellees,
Cross-appellants,

v.

OLIN CORPORATION, Appellant,
Cross-appellee.

Nos. 85–2110, 85–2111.

United States Court of Appeals,
Eighth Circuit.

Submitted June 9, 1986.

Decided Dec. 2, 1986.

Ross L. Thorfinnson, Hopkins, Minn., for appellant.

Steven C. Weiss, Chicago, Ill., for appellee.

Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge and BOWMAN, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Olin Corporation (Olin) appeals from the district court's[1] judgment holding it liable in the sum of $150,885.18, plus costs, for undercharges incurred by Inman Freight Systems (Inman) for carriage and delivery

of motor freight cargo. For reversal, Olin argues that the district court erred when it (1) rejected Olin's affirmative defense of misrouting; (2) misapplied the tariffs to the subject shipments; and (3) refused to apply an estoppel defense against Inman. In its cross-appeal, Inman claims that the district court erred by not awarding prejudgment interest. After oral argument, this court asked the parties to submit supplemental briefs addressing whether the issues in this case fall within the primary jurisdiction of the Interstate Commerce Commission (ICC). We have considered these briefs and conclude that we must decide the appeal; not remand to the district court for referral to the ICC. For reasons set forth in this opinion, we affirm in part but direct that the judgment be reduced because no undercharges may be collected during the period from November 14, 1980 to April 1, 1981.

## I. BACKGROUND

This dispute arises out of shipments containing projectile parts and radioactive materials from Honeywell, Inc. to Olin between September 4, 1980 and June 22, 1981. Honeywell tendered the shipments to Wintz Motor Freight, Inc. (Wintz) at New Brighton, Minnesota for delivery to Olin at Marion, Illinois. Because Wintz lacked ICC authority to serve Marion, Wintz needed to interchange the shipments with another carrier. Wintz interchanged all of the subject shipments with Inman at St. Louis, Missouri and Inman delivered each shipment to Olin.

Honeywell, as consignor, prepared the bills of lading and prepaid all freight charges as billed by Wintz. Honeywell also included in the bill of lading a section prohibiting recourse against it for any undercharges subsequently determined by the carriers. Honeywell paid a total of $100,401.82 in freight charges based upon a

1. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of

Missouri. The district court's opinion is report-

commodity tariff rate [2] published in Middlewest Bureau 200 Series Tariff (MWB 200).

Inman subsequently declared bankruptcy and an audit revealed that the Honeywell-Olin shipments were billed incorrectly at a commodity rate substantially lower than the applicable class rate. Inman's trustee in bankruptcy then filed the instant lawsuit to collect the undercharges from Olin, the consignee of the subject shipments.

After a bench trial, the district court found that Wintz had incorrectly assessed the rates named in the MWB 200 tariff. Instead, the rates named in the MWB 501 tariff applied to the subject shipments because it was the only published tariff in which both Wintz and Inman participated. The MWB 200 tariff did not apply to the subject shipments because Inman was not a party to the MWB 200 tariff. The MWB 501 tariff named only a class rate that was substantially higher than the MWB 200 commodity rate actually charged.

The district court also rejected Olin's affirmative defense that Wintz had misrouted the shipments. The trial court found that Associated Truck Lines (ATL) could not have been used as a destination carrier to preserve the commodity rate by interchanging through Chicago, as claimed by Olin. Furthermore, the governing tariff NMF 100-G stated that hazardous shipments should be moved along the shortest route. Because the St. Louis route was shorter, ATL was not an available alternative carrier.

The court also rejected Olin's claim that Inman be estopped from collecting the undercharges because Olin had reasonably relied on the prepaid bills of lading in accepting the shipments and in its subsequent payments to Honeywell. The court noted that estoppel is not favored in suits to collect undercharges and has been applied only in the few cases in which the party sued had already paid the full freight charges. In the instant case, the court found that the full charges according to the applicable tariff had not been paid and thus estoppel was not justified. The district court awarded Inman $150,885.18.[3]

## II. DISCUSSION

### A. Primary Jurisdictions

■ As explained in our discussion below, we do not remand this case to the ICC. The trial court received evidence and testimony from experts on which tariffs applied. Reasonableness of the tariffs was not in dispute. Accordingly, the ICC's special expertise is not required for consideration of issues at dispute in this case. *See, e.g., United States v. Western Pac. R.R.,* 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956); *Distrigas of Massachusetts Corp. v. Boston Gas Co.,* 693 F.2d 1113, 1117–18 (1st Cir.1982).

The matter of equitable defenses, however, raises a different matter. On October 29, 1986, the ICC issued a policy statement that reversed its previous position on equitable defenses. *National Indus. Transp. League,* — I.C.C.2d —, Ex Parte No. MC–177 (Oct. 14, 1986). The ICC essentially stated that in cases referred to it, it would consider whether collection of undercharges would constitute an unreasonable practice considering all of the relevant circumstances.

We note that the ICC's new policy does not apply directly to this case. The ICC's statement specifically applies to cases in which the parties negotiate a rate, but such

---

ed as *Inman Freight Sys. v. Olin Corp.,* 614 F.Supp. 1355 (E.D.Mo.1985).

**2.** A commodity rate establishes charges between specific points and is usually lower than a class rate, which establishes charges for general delivery. A commodity rate is a preferential rate and the carrier is expected to preserve it, if possible. *Inman,* 614 F.Supp. at 1357.

**3.** This amount reflects the entire amount of undercharges due to both Inman and Wintz. Although Wintz is not a party to this suit, recovery of the entire amount by Inman is proper. *Southern Pac. Co. v. Miller Abattoir Co.,* 454 F.2d 357, 359 (3d Cir.1972); *Pennsylvania R.R. v. Greene,* 173 F.Supp. 657, 658 (S.D.Ala.1959). Since both companies are in bankruptcy, presumably a division of the award will be made there.

rate is not published. The parties do not argue here that a negotiated rate was unpublished but instead question the application of the lower published rate to the shipments in question. Accordingly, we do not refer this case to the ICC for possible application of its new policy.

Other considerations support this conclusion. Olin has never asked the district court to stay the proceedings and refer the case to the ICC. The events at issue here occurred six years ago and further delay is simply not warranted. Although the ICC's new policy does not specifically apply here, we recognize that if the ICC were presented with this case, it may well come to a different conclusion. We, however, decline to apply the ICC's newly stated policy ourselves and we do not assume that this policy applies in this case. As discussed below, we will apply existing case law to the estoppel defense. We now turn to Olin's defenses.

### B. Misrouting

Olin argues that it cannot be held liable for any undercharges because Wintz misrouted the shipments. Specifically, Olin contends that Wintz could have transferred the freight at Chicago using ATL as the interline carrier and thereby preserved the commodity rate. Because Wintz failed to use the route with the lowest available rate, Olin asserts that Inman may not recover any additional charges.

█ Generally, if a carrier shows that the published rate was not charged, it may recover the undercharge even if the mistake was mutual or inadvertent. *Louisville & N. R.R. v. Mead Johnson & Co.*, 737 F.2d 683, 686 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 320 (1984). An exception to this rule is recognized when misrouting is shown. Misrouting occurs when several routes with different rates are available and the carrier fails to move over the route with the lowest rate. *Id.; Johnson Machine Works v. Chicago, B. & Q. R.R.*, 297 F.2d 793, 795 (8th Cir.1962). When the carrier misroutes a shipment, the carrier is liable for any over-

charges already paid and may not recover any undercharges after discovering that a higher rate may have applied to the shipment. *Johnson Machine*, 297 F.2d at 793.

█ In the present case, the district court found that an alternate route was not available. The court observed that Wintz could not have interchanged with ATL in Chicago before November 14, 1980 and after April 1, 1981. Wintz and ATL did not have the required bilateral concurrence to the tariff until November 14, 1980. ATL could not participate in joint routes between New Brighton and Marion after April 1, 1981 because it then obtained permanent authority to serve both points. These findings are amply supported by the record. Accordingly, Olin's defense of misrouting fails, at least for the shipments carried before November 14, 1980 and after April 1, 1981.

As for the period between these two dates, the district court found that Wintz had an obligation pursuant to the NMF 100–G tariff to ship the freight over the shortest available route because the shipments contained radioactive material. Because the St. Louis route is thirty-five miles shorter than the route through Chicago, the court held that the commodity rate was not available to Wintz. Accordingly, the court denied Olin's misrouting defense.

█ We disagree with the district court's conclusion. The NMF 100–G tariff requires the shortest available route which may not be the shortest possible route. Secondly, only about fourteen of the eighty-five shipments carried radioactive materials. Finally, the thirty-five mile difference between the St. Louis and Chicago routes is de minimus when considered in the context of the entire trip from New Brighton to Marion. Thus, between November 14, 1980 and April 1, 1981, Wintz could have interchanged with ATL through Chicago. Accordingly, Olin has shown misrouting during the dates indicated and Inman may not recover undercharges for shipments carried during that period.

## C. Misapplication of Tariffs

■ Olin argues that the district court erred when it held that 49 C.F.R. § 1300.64 did not apply to Wintz and ATL. Olin apparently contends that the regulation preserves a commodity rate even in the absence of a published concurrence to the tariff. Thus, ATL could have been an available carrier for the shipments prior to November 14, 1980.

Olin, however, fails to mention that 49 C.F.R. § 1300.64 applies only to those tariffs that contain no routing instructions. The district court specifically found that the MWB 200 tariff contained routing instructions. Even though based on documentary evidence, we may not overturn this finding unless clearly erroneous. Fed. R.Civ.P. 52(a); *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The record clearly supports the district court's finding and accordingly the regulation has no application to the tariffs at issue in this case.

## D. Estoppel

Olin argues that the district court erred when it rejected Olin's estoppel defense. Olin claims that it should not be held liable because the bills of lading were marked prepaid, Olin reimbursed Honeywell according to the bills of lading, and Olin had no notice that further freight charges were owing.

■ A carrier may be estopped from collecting freight charges when the consignee relies on a misrepresentation and is asked to pay double the applicable charges. *Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 351, 102 S.Ct. 1815, 1824, 72 L.Ed.2d 114 (1982); *Southern Pac. Transp. Co. v. Campbell Soup Co.*, 455 F.2d 1219, 1222 (8th Cir.1972). An estoppel defense, however, is not available in a suit for undercharges when carriers simply misquote the rates. *Seaboard Sys. R.R. v. United States*, 794 F.2d 635, 637–38 (11th Cir.1986). Rather, the consignee must have paid the full applicable rate to the consignor in order for the carrier to be estopped from collecting from the consignee. *Campbell Soup*, 455 F.2d at 1222.

■ In the present case, it is clear that no one has yet paid the full freight charges to either carrier. Because Honeywell included a nonrecourse provision in its bills of lading, Olin is liable for the undercharges. *O'Boyle Tank Lines v. Beckham*, 616 F.2d 207, 209 (5th Cir.1980). Olin has not paid the full freight charges and by paying it, it will not be subjected to the inequity of double payment.

## E. Prejudgment Interest

■ In its cross-appeal, Inman claims that the district court erred when it failed to award prejudgment interest. We note that prejudgment interest is normally awarded in claims for undercharges. *Southern Pac. Transp. Co. v. San Antonio*, 748 F.2d 266, 274 (5th Cir.1984); *Louisiana & Ark. Ry. v. Export Drum Co.*, 359 F.2d 311, 317 (5th Cir.1966). Because the district court did not address prejudgment interest, we direct the district court to examine Inman's claim on remand.

## III. CONCLUSION

For the reasons stated above, so much of the judgment as covers undercharges for shipments carried by Inman from September 4, 1980 through November 14, 1980 and from April 1, 1981 through June 22, 1981 is affirmed. As to the inclusion of undercharges between November 14, 1980 and April 1, 1980, however, the trial court erred.

We affirm in part and remand for a recalculation and modification of the judgment in accordance with this opinion. Appellant is entitled to fifty percent of its costs and disbursements on this appeal.