**DELTA TRAFFIC SERVICE, INC.,**
**Oneida Motor Freight, Inc.**

v.

**GEORGIA–PACIFIC CORPORATION.**

**Civ. No. B–87–482 (TFGD).**

United States District Court,
D. Connecticut.

Dec. 1, 1987.

Richard H. Raphael, Silverberg, Marvin & Swaim, New Canaan, Conn., Joseph L. Steinfeld, Jr., Sims, Walker & Steinfeld, Washington, D.C., for plaintiffs.

Fredric H. Weisberg, Cummings & Lockwood, Stamford, Conn., Betty Jo Christian, PHV, Timothy M. Walsh, PHV, Elizabeth Jordan Gianturco, PHV, Steptoe & Johnson, Washington, D.C., for defendant.

### RULING ON MOTION TO STAY AND REFER

DALY, Chief Judge.

Plaintiffs commenced this action to collect certain undercharges for transportation services. Specifically, plaintiffs seek to collect the difference between the rate Oneida[1] allegedly agreed to charge Georgia–Pacific Corp, the shipper, and a higher rate contained in the Oneida's tariff filed with the Interstate Commerce Commission ("ICC"). In the motion *sub judice*, defendant asks this Court to stay the action and to refer to the ICC the question of whether plaintiffs' collection efforts constitute an "unreasonable practice" under the Motor Carrier Act of 1980. 49 U.S.C. § 10701(a). In effect, defendant urges this Court to

---

1. Plaintiff, Delta Traffic Service, Inc., is a collection agency.

interpose an equitable defense against plaintiffs' action. Because the equitable defense raised here is statutorily barred, referral is not warranted.

### Discussion

Interstate motor carriers have been under federal regulation since 1935. Under the regulatory scheme, a carrier must publish and file its rates prior to rendering transportation service. Through this requirement shippers and competing carriers are afforded the opportunity to discover, *inter alia,* discriminatory rates. The Congressional anti-discrimination policy was codified in section 217(b) of the Motor Carrier Act of 1935, formerly codified at 49 U.S.C. § 317(b), and rewritten for purposes of clarity in 1980. The statute provides: "That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff...." 49 U.S.C. § 10761(a). This language codified the "filed rate doctrine" which was established in the original Act to Regulate Commerce of 1887.[2] Under the filed rate doctrine, a common carrier must collect the rates, fares, and charges filed with the ICC. The reason for this rule was Congress' desire to eliminate secret discounts and preferential treatment for big shippers. As the Supreme Court stated in *Louisville & N.R.R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915):

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted under any pretext... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and obviously may work hardship in some cases, but it embodies the policy which has been adopted by the Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

Judicial adherence to the filed rate doctrine has been unwavering, whether the defense entails an intentional or inadvertent misquotation of rates. *See e.g., Thurston Motor Lines v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983); *Southern Pacific Transp. Co. v. Commercial Metals Co.,* 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982); *Louisville & N.R.R. Co. v. Rice,* 247 U.S. 201, 202, 38 S.Ct. 429, 429, 62 L.Ed. 1071 (1918); *Siegel v. Converters Transp. Inc.,* 714 F.2d 213 (2d Cir.1983); *Western Transp. Co. v. Wilson & Co.,* 682 F.2d 1227 (7th Cir.1982). *See generally,* Goodman, *Unfiled Motor Common Carrier Rates Gain New Respectibility as the ICC Celebrates its Centennial,* 54 Transp.Prac. J. 292 (Spring 1987). The filed rate doctrine also precludes deviations from the filed rate on the basis of contracts between carrier and shipper. *Louisville & N.R.R. v. Central Iron & Coal Co.,* 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) (dicta); *Fry Trucking Co. v. Shenandoah Quarry, Inc.,* 628 F.2d 1360, 1363 (D.C.Cir.1980) (carrier awarded difference between agreed upon contract rates and unpublished rates); *Nyad Motor Freight, Inc. v. W.T. Grant Co.,* 486 F.2d 1112, 1114 (2d Cir.1973) ("a common carrier may, despite its own complicity, recover any illegal differential between its filed rates and the actual charges made"). *See Rice,* 247 U.S. 201, 38 S.Ct. 429 (carrier's claim is based not on an understanding with the shipper, but on the tariff).

Thus, the tariff filing and collection requirements are central to the anti-discrimination policy of the Motor Carrier Act of 1980. Indeed, under the Elkins Act of 1903, it is a criminal offense for a carrier or shipper to knowingly deviate from the filed tariff, or for a carrier to willfully fail to file and publish its rates. 49 U.S.C. § 11903(a) and (b).

Against this backdrop, the ICC has attempted to resurrect equitable defenses in collection cases such as the one at bar. The ICC's effort was spurred by the intensely competitive atmosphere in the motor carrier industry which resulted from the Motor Carrier Act of 1980. The competition brought about rapid changes in rates,

---

**2.** See section 6 of the original Act formerly codified at 49 U.S.C. § 6.

thereby affording carriers little time for filing rates and shippers little time to verify that the rates actually negotiated are in fact published. The ICC has attempted to address the problem of undercharge collection cases resulting from negotiated but unfiled rates, in its policy statement Ex Parte No. MC–177, *Rulemaking on Negotiated Carrier Rates,* — I.C.C.2d — (1986) ("Ex Parte No. MC–177"). In this policy statement, the ICC reversed its long-standing position regarding equitable defenses. The ICC reasoned that "an inflexible policy frustrates the intent of the [national transportation policy] to encourage pricing innovation, since it could chill rate negotiation between shippers and carriers, and inhibit legitimate pricing initiatives. On the other hand, permitting equitable defenses in limited situations comports with the spirit of the [national transportation policy]." Ex Parte No. MC–177 slip op. at 7. The ICC recognized that it was without jurisdiction to order waiver of motor carrier undercharges, and therefore, sought only to render advisory opinions under the primary jurisdiction doctrine regarding whether the collection of undercharges would be an unreasonable practice under 49 U.S.C. § 10701(a)[3].

In its policy statement, the ICC relied heavily on *Seaboard System R.R. v. United States,* 794 F.2d 635 (11th Cir.1986). In that case the court reviewed an ICC order denying a rail carrier undercharges where the published tariff was confusing, and the carrier misquoted rates which the shipper relied on. The court upheld the ICC's finding that, under the circumstances, it was an unreasonable practice to permit the carrier to collect undercharges. The case at bar, of course, does not involve a confusing tariff. The court reasoned that *Maxwell* and its progeny related only to the *court's* authority to grant equitable defenses to undercharge cases, and that changed circumstances warranted a re-examination

of the ICC's policies regarding equitable defenses.

This Court does not read *Maxwell* and its progeny with the same limitation. The filed rate doctrine is a statutory rule of law that applies in all cases. This distinction rings hollow when considered in light of the fact that the ICC does not have the authority to waive undercharges in motor carrier cases[4]. Ex Parte No. MC–177 slip op. at 7. Moreover, the ICC itself has long applied the filed rate doctrine strictly. *Id.* With respect to the argument that changed market circumstances warranted a re-examination of the policies regarding equitable defenses, the Court presumes that Congress was fully aware of the market consequences that the Motor Carrier Act of 1980 would create. Despite this there is no indication that Congress intended to change existing law regarding strict adherence to the filed rate doctrine. *See Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). The ICC, although free to change its policies, is not free to change a clearly established rule of law. The Court is simply not persuaded that the general requirement of maintaining reasonable practices, can contravene the specific requirement that rates must be filed and that no deviations are permitted from those rates.

The question raised by this case is what the appropriate tariff rates are. This question does not require the expertise of the ICC and does not implicate issues of transportation policy. This Court agrees with Judge Carrigan's decision in *Motor Carrier Audit & Colection Co. v. United Food Service, Inc.,* Civil Action No. 87–C–298 (D.C. May 4, 1987) [available on WESTLAW, 1987 WL 19008], where he found that "[n]either the decision in *Seaboard* nor the policy statement issued by the ICC in Ex Parte No. MC–177 excuse this court from its obligation to follow clear Supreme Court precedent."

---

**3.** The statute reads, in relevant part: "A rate (other than a rail rate), classification, rule or practice related to transportation or service provided by a carrier ... must be reasonable." 49 U.S.C. § 10701(a).

**4.** The ICC apparently does have jurisdiction to award monetary reparations in railroad cases.

Because referral of this matter to the ICC will not be fruitful, the defendant's motion to refer issues regarding appropriate rates and to stay this action is DENIED.