**In re ROBINSON TRUCK LINES, INC., Debtor.**

**Jacob C. PONGETTI, Trustee for the Estate of Robinson Truck Lines, Inc., Plaintiff,**

v.

**BALDOR ELECTRIC COMPANY, Defendant.**

**Jacob C. PONGETTI, Trustee for the Estate of Robinson Truck Lines, Inc., Plaintiff,**

v.

**BRYAN FOODS, INC., Defendant.**

**Jacob C. PONGETTI, Trustee for the Estate of Robinson Truck Lines, Inc., Plaintiff,**

v.

**ARTEX INTERNATIONAL, INC., Defendant.**

Bankruptcy No. ES84–10194.
Adv. Nos. 86–0064, 86–0069 and 86–0090.

United States Bankruptcy Court, N.D. Mississippi.

July 29, 1988.

Louis J. Wade, Culp and Wade, Kansas City, Mo., for Jacob C. Pongetti.

Harold D. Miller, Jr. and E. Marcus Wiggs, III of Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., for Bryan Foods, Inc. and Artex Intern., Inc.

Michael D. Hart, St. Louis, Mo., for Baldor Elec. Co.

## MEMORANDUM OPINION

DAVID W. HOUSTON, III,
Bankruptcy Judge.

Before the Court for consideration are the motions to adopt the decisions of the Interstate Commerce Commission and for summary judgment filed by the defendants, Baldor Electric Company, hereinafter Baldor, Bryan Foods, Inc., hereinafter Bryan, and Artex International, Inc., hereinafter Artex; as well as, the motion for summary judgment filed by the plaintiff, Jacob C. Pongetti, trustee for the estate of Robinson Truck Lines, Inc., hereinafter plaintiff and/or trustee; and the Court having heard and considered same hereby finds as follows, to-wit:

### I.

The Court has jurisdiction of the parties to and the subject matter of these proceedings pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. These are core proceedings as defined in 28 U.S.C. § 157(b)(2)(A)(E) and (O).

### II.

### STATEMENT OF FACTS

On May 7, 1984, Robinson Truck Lines, Inc., hereinafter referred to as Robinson, filed a voluntary Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Northern District of Mississippi. On July 2, 1985, Robinson converted its Chapter 11 bankruptcy case to a case under Chapter 7 of the Bankruptcy Code and the plaintiff was appointed as trustee.

### · BALDOR ELECTRIC COMPANY

On May 21, 1986, the plaintiff commenced an adversary proceeding (No. 86–0064) against the defendant Baldor seeking to collect the sum of $16,664.01 for balances allegedly due on freight charges. The amount demanded represented the difference between the tariffs filed by Robinson with the Interstate Commerce Commission, hereinafter referred to as the Commission or ICC, and the amount actually received and collected by Robinson for the transportation services that it had rendered to Baldor.

### BRYAN FOODS, INC.

On May 21, 1986, the plaintiff commenced an adversary proceeding (No. 86–0069) against the defendant Bryan seeking to collect the sum of $26,969.21 for balances allegedly due on freight charges. In July, 1987, the plaintiff amended his complaint to demand a total of $25,783.66. The amount demanded represented the difference between the tariffs filed by Robinson with the ICC and the amount actually re-

ceived and collected by Robinson for the transportation services that it had rendered to Bryan.

### ARTEX INTERNATIONAL, INC.

On May 21, 1986, the plaintiff commenced an adversary proceeding (No. 86–0090) against the defendant Artex seeking to collect the sum of $28,092.08 for balances allegedly due on freight charges. In November, 1987, the plaintiff amended his complaint to demand a total of $65,936.82. The amount demanded represented the difference between the tariffs filed by Robinson with the ICC and the amount actually received and collected by Robinson for the transportation services that it had rendered to Artex.

### III.

Pursuant to motions filed by the defendants, the Court referred each of the adversary proceedings to the ICC for an advisory opinion as to whether the tariffs filed by Robinson were reasonable and/or whether the collection of the alleged undercharges by the plaintiff would constitute an unreasonable practice. On January 20, 1988, the ICC rendered its decision, No. MC–C–30019, regarding the petition for declaratory order filed by Baldor. Subsequently, on April 1, 1988, the ICC rendered its decisions, No. MC–C–30022 and No. MC–C–30023, regarding the petitions for declaratory orders filed respectively by Artex and Bryan. The decisions, which were favorable to the defendants, held that a negotiated rate, lower than the filed tariff rate, had been agreed to by Robinson and the defendants, and that it would be an unreasonable practice to require the defendants to pay the undercharges for the difference between the amounts previously billed and paid and the higher amounts reflected in the filed tariffs.

The defendants have requested this Court to adopt and/or confirm the decisions of the ICC. This relief is obviously contested by the plaintiff.

### IV.

### CONCLUSIONS OF LAW

These proceedings essentially involve the interplay between three (3) statutes, 49 U.S.C. § 10761(a), on the one hand, and 49 U.S.C. §§ 10701(a) and 10704 on the other hand. Title 49 U.S.C. § 10761(a) is the genesis for what is commonly referred to as the "filed rate doctrine", and is set forth in pertinent part as follows:

> Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under Chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.

Title 49 U.S.C. § 10701(a), which is made enforceable by Title 49 U.S.C. § 10704, provides in pertinent part as follows:

> A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under Chapter 105 of this Title must be reasonable.

Title 49 U.S.C. § 10704 conveys primary jurisdiction to the ICC to determine the reasonableness of rates, classifications, rules, and practices observed or undertaken by transportation carriers. The concept of primary jurisdiction is explained in *American Trucking Associations, Inc. v. I.C.C.*, 682 F.2d 487 (5th Cir.1982), as follows:

> The doctrine of primary jurisdiction, far from an abdication of judicial responsibility, allows a court when faced with an issue which calls into question an area of special expertise of an agency to suspend proceedings pending referral of the issue to the agency for its official position.

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.... "Primary jurisdiction," ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132 (1956) (citation omitted). In explaining the use of primary jurisdiction in *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952), the Supreme Court stated:

The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

342 U.S. at 574–75, 72 S.Ct. at 494, 96 L.Ed. at 582. The Court also indicated that this technique was originally applied in the context of ICC proceedings.

This Court, following the path established by the Supreme Court, has invoked the principle of primary jurisdiction within a variety of contexts, when faced with "an agency statutorily invested with responsibility for the determination and effectuation of policy within the given field which will be affected or influenced by, or influence, the issue posed for Court determination." *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 243 (5th Cir.1976). When faced with two roads diverging, one leading through the unmarked forest of judicial guesswork and one leading through the clearing of agency expertise, this Court has preferred to take the less traveled by, that of primary jurisdiction. Although primary jurisdiction provides a temporary refuge from a difficult decision, we carefully examine the question presented to us to determine whether the rationale underlying primary jurisdiction applies and whether further determination by the agency will illuminate those issues before us. "What bears continual emphasis is that the Court neither passes off final decision on to another tribunal nor escapes from its ultimate duty to decide. For after the exercise of primary jurisdiction determination by the agency concerned, the case comes back in a suitable way for the Court, as a Court, to act." *Usery*, 531 F.2d at 241. *Id.* at 491.

Earlier in these proceedings, this Court recognized that it lacked authority to determine the reasonableness of Robinson's rates and practices, and as such, referred these proceedings to the ICC for an advisory opinion. The Court anticipated that the ICC would analyze the factual circumstances and issue an opinion as to whether the tariffs and practices were reasonable. *See, Western Transportation Co. v. Wilson and Co., Inc.*, 682 F.2d 1227 (7th Cir.1982), *Seaboard System Railroad, Inc. v. U.S.*, 794 F.2d 635 (11th Cir.1986), and *Younger Transportation, Inc. v. TMBR Drilling, Inc.*, MO–85–CA–20 (W.D.Tex. Sept. 23, 1987). As set forth more fully hereinbe-

low, this Court's anticipations were not realized, and this exercise, invoking the primary jurisdiction of the ICC, can at best be described as disappointing.

## V.

Prior to the adoption of the Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 824 (1980), the judicial decisions were unanimous in upholding the filed rate doctrine enunciated in 49 U.S.C. § 10761(a). One early example was *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), where the Supreme Court observed:

> "Neither the intentional or accidental misstatement of the applicable published rate will bind the carrier or the shipper. The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed." ... It was "the purpose of the act to have but one rate, open to all alike, and from which there could be no departure."

*Id.* at 98, 35 S.Ct. at 496 (quoting *Kansas City Southern Rail Co. v. Carl*, 227 U.S. 639, 653, 33 S.Ct. 391, 395–96, 57 L.Ed. 683 (1913) and *Boston & M.R. Co. v. Hooker*, 233 U.S. 97, 110, 34 S.Ct. 526, 395, 58 L.Ed. 868 (1914)).

Judge Posner, writing for the 7th Circuit, stated the following in *Western Transportation Co. v. Wilson and Co., Inc.*, 682 F.2d 1227 (7th Cir.1982):

> But Congress did not create a flexible standard for the courts to apply in accordance with the facts, equities, and economic realities of the particular case. It forbade carriers to receive any different compensation from the rate in the applicable tariff.... There is no judicial power of equitable reformation of tariffs as of ordinary contracts.

*Id.* at 1231.

There are numerous decisions which have followed this reasoning, including the recent Supreme Court case of *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed. 2d 413 (1986). *See also, Regular Common Carrier Conference v. United States*, 793 F.2d 376 (D.C.Cir.1986), *Aero Trucking Co., Inc. v. Regal Tube Co.*, 594 F.2d 619 (7th Cir.1979), and *Illinois Central Gulf Railroad Co. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588 (5th Cir.1978).

Although *Square D* clearly states that the filed rate doctrine was not changed by the enactment of the Motor Carrier Act of 1980, it, like most of the other cases, did not address the issue of whether the tariff or practice was reasonable as required by 49 U.S.C. § 10701(a). It also did not address the primary jurisdiction of the ICC to determine the reasonableness of the carrier's tariffs or practices. As noted in *In Re Tucker Freight Lines, Inc.*, 85 BR 426 (DC WD Mich.1988), the tariffs in *Square D* were presumptively reasonable because they had been approved by the ICC.

## VI.

An obvious tension has developed between the filed rate doctrine of 49 U.S.C. § 10761(a) and the concept of primary jurisdiction being vested in the ICC to determine the reasonableness of tariffs or carrier practices pursuant to 49 U.S.C. §§ 10701(a) and 10704. One source of this tension can be found in the recent ICC policy decision enunciated in *National Industrial Transportation League—Petition to Institute Rules on Negotiated Motor Common Carrier Rates*, 1986 Fed. Carr.Cas. (CCH) ¶ 37,284 (ICC Ex Parte No. MC–177 Oct. 14, 1986) hereinafter referred to as *Negotiated Rates* or *MC–177*. The following quotations are extracted from that opinion:

> The principal that the charges contained in an applicable tariff must be assessed regardless of any agreement between shipper and carrier arose during an era of strict entry and rate regulation. Requiring strict adherence to the tariff rate was intended to avoid intentional carrier misquotation of rates as a means to offer secret discounts to particular shippers.

*Id.* at 47,350.

> The new business atmosphere requires these carriers to price competitively and on extremely short notice if they are to

retain existing traffic or quickly obtain new (including backhaul) traffic.

*Id.* at 47,351.

We believe, in the highly competitive motor carrier industry and economy in general, equitable defenses to rigid application of a filed tariff rate should be available on a case by case basis and that our unreasonable practice jurisdiction authorizes such an approach.

*Id.*

In short, we offer to undertake an advisory analysis of whether a negotiated but unpublished rate existed, the circumstances surrounding assessment of the tariff rate, and any other pertinent facts. We would, at a Court's request, determine, based on all relevant circumstances, whether collection of undercharges based on the rate contained in the filed tariff would constitute an unreasonable practice and, if a negotiated rate is found to exist, whether this amount is all the carrier should be permitted to collect. The referring Court would retain final authority to set the remedy, if any, and review our determination.

*Id.* at 47,352.

In implementing this policy statement case by case, we will resolve what the tariff rate is and then analyze, under our practices jurisdiction, whether collection of the tariff rate is a reasonable practice.

*Id.* at 47,353.

Consistent with the statutory scheme, the Court retains its authority to set the remedy and accept or reject the Commission's conclusions.

Although *MC–177* was an attempt to reconcile the tension between the filed rate doctrine and the primary jurisdiction of the ICC to determine the reasonableness of rates or practices, there have been numerous judicial decisions that have refused to refer cases or proceedings to the ICC, concluding that the filed rate doctrine supercedes any grant of jurisdiction to the ICC to determine the reasonableness of rates or practices. Succinctly stated, these decisions hold that because a shipper is statutorily obligated to pay the filed tariff rate, that a decision of the ICC that such rate is

unreasonable or that it would be an unreasonable practice to collect the filed rate is meaningless. *See, e.g., Motor Carrier Audit and Collection Co. v. United Food Service,* 1987 Fed.Carr.Cas. (CCH) ¶ 83,326 [available on WESTLAW, 1987 WL 19008]; *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chemical Co.,* No. C–87–0048–MHP (ARB) (N.D.Cal. July 28, 1987) (available on WESTLAW, 1987 WL 46871); *In Re Total Transportation, Inc.,* 84 B.R. 590 (D.C.D.Minn.1988); *Robert Yaquinto, Jr., Trustee for Caravan Refrigerated Cargo, Inc. v. Supreme Beef Processors, Inc.,* CA 3–87–2274–R (N.D.Tex., January 20, 1988) [available on WESTLAW, 1988 WL 79493] and *In Re Carolina Motor Express, Inc.,* 84 B.R. 979 (Bankr.W.D. N.C.1988).

To the contrary, other cases have held that *MC–177* does not conflict with the filed rate doctrine, and that, as such, an initial referral to the ICC for an advisory opinion is appropriate. *See, Seaboard System Railroad, Inc. v. U.S.,* 794 F.2d 635, (11th Cir.1986); *Younger Transportation, Inc. v. TMBR Drilling, Inc.,* MO–85–CA–20 (W.D.Tex. Sept. 23, 1987); *In Re Tucker Freight Lines, Inc.,* 85 B.R. 426 (D.C.W.D. Mich.1988).

A case noted earlier, *Western Transportation Co. v. Wilson & Co., Inc.,* 682 F.2d 1227 (7th Cir.1982) upheld the filed rate doctrine, but at the same time, recognized that the ICC had authority to determine that a tariff was unreasonable, to-wit:

But it does not follow that the shipper is necessarily without any remedy in a case like this. A tariff provision has to be reasonable. See 49 U.S.C. § 10704(a). If it is not, it violates the statute; and the Commission, either on its own initiative or on complaint, "shall take appropriate action to compel compliance with" the statute. 49 U.S.C. § 11701. If the notation requirement is, as it appears to be, entirely pointless, the Commission can be expected to set aside this part of the tariff—thus knocking the props out from under Western's case—if asked to do so. Wilson should have done what Iowa Beef Processors, Inc., another of

Western's customers, did when sued by Western in bankruptcy court on the very tariff in issue in this case—ask for a stay of the court proceedings and then ask the Commission to declare the notation requirement unreasonable. The Commission did so. *Iowa Beef Processors, Inc. v. Western Transp. Co.*, ICC Docket No. 32521F (Sept. 14, 1981). Incidentally, the Commission also found the tariff to be unambiguous—that is why it had to reach the issue of reasonableness—and this finding should have carried great weight with the district court in the present case.

Although it seems highly likely that the Commission would, if asked, hold that the notation requirement was unreasonable as applied to Wilson—since, as we have said, it is the same requirement, in the same tariff, that Iowa Beef successfully challenged—the district court did not have the power to declare the requirement unreasonable. Only the ICC can do that, see, e.g., *Texas & P.R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 448, 27 S.Ct. 350, 358, 51 L.Ed. 553 (1907); *ICC v. Atlantic Coast Line R.R.*, 383 U.S. 576, 579–80, 86 S.Ct. 1000, 1003–04, 16 L.Ed.2d 109 (1966); and Wilson, for reasons unexplained, failed to ask the court for a stay to permit a reference to the ICC. . . .

*Id.* at 1231.

Recognizing that there was legitimate precedent to refer these proceedings to the ICC, this Court acted accordingly. The ICC has now rendered and filed its decisions. The next step, therefore, is to examine and evaluate the scope of these decisions, which the ICC has itself denominated as advisory opinions.

### VII.

■ When this Court referred the three proceedings to the ICC, it did so with the following purposes in mind:

1. To ascertain the applicable tariffs.
2. To determine whether the tariffs were unreasonable.
3. To determine whether the tariffs or rates were ambiguous.
4. To ascertain whether the carrier's practices were unreasonable. (For example, did the carrier intentionally misquote the tariff or mislead the shippers, or was there a lengthy history of tariff misquotation?)
5. To determine whether the collection of the filed tariffs, because of the underlying circumstances, would constitute an unreasonable practice by the carrier.

The above and foregoing are items that appear to have been contemplated by the ICC in *MC–177*.

In the decisions rendered by the ICC, MC–C–30019 (*Baldor*), MC–C–30022 (*Artex*), and MC–C–30023 (*Bryan*), the following conclusions were reached:

1. The ICC found negotiated rates in each proceeding in spite of evidence to the contrary, i.e., testimony to the effect that the rates were quoted in error, billings at rates other than those proposed by the carrier, a lack of clarity in the proposed rates, multiple rates being applicable to the same traffic, and billings reflecting varying discount factors.

Confirming this comment by the Court is the dissent of Commissioner Simmons, set forth in the *Artex* and *Bryan* decisions, which is most illuminating. It is set forth as follows:

Under the circumstances involved, I find that there is no evidence that a negotiated rate existed between Bryan Foods and Robinson Truck Lines. While there was discussion between Bryan's fleet manager and Mr. Peeples, of Robinson, there is no evidence of a clear meeting of the minds. In finding that an agreed rate existed, the majority fails to pinpoint for certainty the amount of the alleged discounts that were to apply on Bryan's LTL shipments. Indeed, the freight bills submitted to us as evidence show discounts of either 15 or 25 percent. As for the truckload traffic, the written rate "proposal" introduced into evidence does nothing to clarify the contention as to whether there was ever an agreed upon rate. Rather, that "propos-

al" contains several interlineations, and in some cases more than one rate appears to apply to the same traffic. Hence, this "proposal" is not useful in establishing that: (1) the shipper and carrier negotiated and *agreed* on a rate that was not published in a tariff and (2) Bryan, acting in a reasonable manner, relied on the quote. Moreover, of 44 disputed shipments, six were billed at rates other than the rates appearing on Mr. Peeples' proposal, another six were for traffic moving to points not listed on the proposal, and three were for shipments moving before the date of the proposal. Therefore, over one-third of the disputed shipments moved at rates that are not supported by the proposal. It is difficult for me to conceive how one can argue that Bryan could reasonably rely on the Peeples' proposal given its lack of clarity and the significant amount of traffic billed at rates not even listed in the proposal. A reasonable person would surely question freight bills that are inconsistent with rates contained in the written proposal, especially when that proposal is used to support the claim that the shipper had agreed to the rates in that document.

Further, Bryan has introduced no evidence that it reasonably relied upon the Peeples' proposal. Although he solicited traffic for Robinson, it has not been established that Mr. Peeples had any actual or implied authority to negotiate rates. He is only identified as an "employee" and Bryan has not shown that he held a position giving him authority to negotiate rates for Robinson.

Given the significant discrepancies in the evidence submitted in this proceeding, it is now clear that the majority will accept any evidence, no matter how frail, that suggest that some negotiations occurred between a shipper and carrier. To the majority it is no longer a question of whether a shipper behaved reasonably under the circumstances. In my view, this policy mocks the well reasoned positions established in *Negotiated Rates* and the *Wakeform* decision. If this pattern continues, courts will be inclined to question the seriousness of our deliberations. In fact, courts may be reluctant to defer to our judgment at all.

I.C.C. Decisions No. MC–C–30022 and No. MC–C–30023 (April 1, 1988) p.p. 7, 8.

2. The ICC found that the shippers reasonably relied on the rates quoted by the carrier in spite of evidence to the contrary.

In this context, the Court looks to the dissent of Commissioner Simmons in the Baldor decision where he states, in part, as follows:

> In my view, the record as a whole shows that Baldor officials attached little importance to whether the rates they paid were based on lawfully filed and effected tariffs. The December 19, 1982, letter from Perry to Baldor in which Perry promised to "protect" the negotiated rates even though they would not be legally effective for 45 days, and Baldor's subsequent tender of tariffs under these rates, best illustrates Baldor's attitude. Given this attitude, I cannot find that Baldor "reasonably" relied on representations by the carriers or that it is entitled to equitable relief from the filed rate doctrine.
>
> The majority's approach to this issue is mechanical and not in keeping with the broad principals underlying the concept of equitable relief.

I.C.C. Decision No. MC–C–30019 (January 20, 1988) p.p. 9, 10.

The Court recognizes that this comment by Commissioner Simmons is primarily related to the carrier, Perry Motor Freight, Inc., rather than Robinson, but it most certainly "illustrates the attitude" of Baldor as to its "reasonable" reliance on carrier representations.

3. In the absence of proof by the shippers, there was no conclusion by the ICC as to whether the filed tariffs were reasonable or unreasonable.

4. The ICC conceded that 49 U.S.C. § 10761(a) has not been abrogated and that carriers must charge the filed tariff rate. The Commission, however, went on to say in keeping with *MC–117*, that under certain circumstances, it has the authority to find

that the collection of the tariff rate would be unreasonable. I.C.C. Decision No. MC–C–30019 (January 20, 1988) p. 6.

5. In effect, the "bottomline" conclusion by the ICC was that since there were negotiated rates, it would be an unreasonable practice to permit the carrier to collect the undercharges.

From all indications, it appears that the ICC has embarked on a pattern of finding negotiated rates between shippers and carriers in every case where carriers or bankruptcy trustees are attempting to collect undercharges. When there is a finding of negotiated rates by the ICC, the conclusion appears to be inescapable thereafter that it would be an unreasonable practice to permit the collection of the undercharges. In the opinion of this Court, the ICC has a role in proceedings such as this, but it cannot expand its role beyond what is contemplated by the statutes. Obviously, there were not negotiated rates, in a contractual sense, in all of these proceedings. Even so, a finding of negotiated rates should not automatically signal the follow-up conclusion of unreasonable carrier practices. Such reasoning would permit shippers and carriers to avoid the filed rate doctrine by simply agreeing on a rate. The filed tariffs could largely be ignored. This line of thought takes 49 U.S.C. §§ 10701(a) and 10704 beyond their intended purpose and undercuts the vitality of 49 U.S.C. § 10761(a), which is clearly contrary to law.

Based on a thoughtful review of the decisions rendered by the ICC in the three proceedings referred to it by this Court, this Court is of the opinion that it cannot confirm or adopt any of the decisions. Consequently, an order will be entered denying the motions of the defendants.

## VIII.

■ The Court further finds that there are a number of major factual issues that remain in dispute, and, as such, the motion for summary judgment filed by the plaintiff must be overruled. Bankruptcy Rule 7056; Fed.R.Civ.P. 56(c). Each of these proceedings will be scheduled on this Court's trial calendar.

An order will be entered consistent with this opinion.