party threatening an infringement suit.[21]

DELTA TRAFFIC, et al., Plaintiffs,

v.

TRANSTOP INC., Defendant.

Civ. A. No. 87–1739–WF.

United States District Court,
D. Massachusetts.

June 5, 1989.

---

## MEMORANDUM AND ORDER

WOLF, District Judge.

On July 7, 1987, Plaintiffs Delta Traffic Service, Inc. ("Delta") and Oneida Motor Freight, Inc. ("Oneida") sued defendant Transtop Incorporated ("Defendant") to collect unpaid freight bills for freight moving in interstate commerce. Defendant subsequently filed two motions with this court: (1) Motion to Refer Issues and Controversy to the Interstate Commerce Commission for Determination and to Further Stay Proceedings Pending a Decision by the Interstate Commerce Commission ("ICC"), filed on January 20, 1988; and (2) Defendant's Motion to Stay Proceedings Pending a Decision by the ICC in MC–C–30090 *National Industrial Transportation League—Petition for Declaratory Order on Motor Common Carrier Negotiated Rates,* filed on June 20, 1988. After a hearing, these motions were taken under advisement on January 25, 1989. On February 22, 1989, plaintiffs filed a Motion for Summary Judgment. On February 28, 1989, defendant filed a Motion to Deny Plaintiffs' Motion for Summary Judgment.

The court has concluded that, for the reasons set forth below, plaintiffs' Motion for Summary Judgment should be granted and defendant's motions must be denied.

## I. THE FACTS

The undisputed facts in this case are the following.

Oneida is a motor common carrier operating in interstate commerce pursuant to the authority of the ICC. Delta is a freight audit company that audited Oneida's freight bills to determine whether those bills had been paid and/or properly rated according to the tariffs filed with the ICC and the various state regulatory agencies. Oneida, which filed for bankruptcy in 1985, has appointed Delta as its agent to collect all amounts due and owing Oneida.

Defendant Transtop used Oneida as the carrier for various shipments from February 1984 to September 1985. Oneida performed its services pursuant to its authority as issued by the ICC and various state regulatory agencies. Although defendant paid in full the amounts billed as owed to Oneida, Delta's audit for Oneida discovered that defendant had been undercharged. Pursuant to 49 U.S.C.App. § 10761, carriers must file rates for service with the ICC. Carriers may not charge or receive compensation at a rate different from that in the filed tariff. When Delta compared the commodities, weights, points of origin, destination, and declared value of each shipment to the applicable tariff rate and rules provisions that Oneida had filed with the ICC, however, it discovered that Oneida had undercharged Transtop by $53,701.82.[1] Plaintiffs seek to collect these undercharges under 49 U.S.C. §§ 10741(a), 10761 and 10762 (the "Interstate Commerce Act").

Defendant denies that the additional sums are owed to Oneida. It argues that at the time defendant considered using Oneida as its shipper, Oneida's employees or agents, as an inducement to secure defendant's business, orally quoted the defendant certain freight rates and charges for the transportation of the shipments between named origin and destination points. These quoted freight rates and charges were discussed by the parties either in personal meetings or in various telephone conferences between the parties. Following the negotiations between the parties, the quoted freight rates and charges were accepted by defendant. (Affidavit of Janice Kelley, Director of Operations at Transtop).

During the negotiations, Oneida's personnel represented to defendant that the quoted freight rates and charges, as agreed to by the parties, were published to

---

**1.** In their original complaint, plaintiffs sought to recover $53,701.82 plus reasonable attorneys fees, and pre-judgment and post-judgment interest. The affidavit of R.E. Stulting, Rate Auditor for Delta, confirms this to be the accurate amount of undercharges. Plaintiffs later amended the complaint to claim $54,207.99. Although the amended complaint appends substantiation for the increase, the amended complaint is not verified and is not evidence before this court. Thus, the original amount at issue has been used for the purpose of this opinion.

cover the period of the shipments in the pertinent tariffs then on file, or to be filed and published, with the ICC as required by 49 U.S.C. § 10762(a). Oneida's original freight bills for the shipments confirmed the agreed upon freight rates and charges, and reinforced defendant's belief that Oneida had published the agreed upon freight rates and charges in the pertinent tariffs filed with the ICC. (Affidavit of Bill McGoldrick, Sales Representative for Oneida).

Defendant was billed for the shipments at the agreed upon freight rates and charges. Transtop subsequently paid Oneida the full amount of those bills. Approximately three years later, Oneida assessed substantially higher freight rates and charges for the shipments, in the amount of $53,701.82, alleging that the higher freight rates and charges were those actually stated in the pertinent tariffs filed with the ICC during the period of the shipments. Despite the representations of Oneida's employees or agents, the orally quoted, agreed upon, and confirmed freight rates and charges were never published by Oneida in the pertinent tariffs with the ICC.

## II. DISCUSSION

The parties' disputes to date have focused on the applicable legal standards, rather than on the facts. Specifically, the question presented is whether the plaintiff is entitled to collect the filed tariff rates, or whether defendant has an equitable defense because Oneida's negotiated rate practice might be deemed unreasonable. Having considered the arguments of the parties and the applicable legal precedents, this court finds that, as a matter of law, plaintiff is entitled to collect the undercharges to the filed tariff rates. Plaintiff is, therefore, entitled to summary judgment.

### A. The Filed Rate Doctrine Applies to This Negotiated Rate Dispute

The Interstate Commerce Act, 49 U.S.C. § 10762(a)(1), requires all motor common carriers to publish and file tariffs containing their transportation rates with the ICC. Once the tariff has been specified for a particular service, the carrier "may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff." 49 U.S.C. § 10761(a). This doctrine, known as the "filed rate doctrine," has been repeatedly reaffirmed by, and applied in, the courts. In *Louisville & N.R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915), for example, the Supreme Court observed:

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it.... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. The rule is undeniably strict, and it may work hardship in some cases, but it embodies the policy which has been adopted by Congress in regulation of interstate commerce in order to prevent unjust discrimination.

Although the filed rate doctrine developed at a time when Congress was concerned with eliminating secret discounts and preferential treatment for big shippers that were common in the late nineteenth century, the statutory mandate has never been altered by Congress. Indeed, when Congress re-examined this area in 1980, it did so in light of section 10761(a) and the long standing judicial interpretations of that statute. *See* Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 793 *et seq.* At that time, Congress changed the filing requirements for contract carriers, but left the filed rate doctrine for common carriers such as Oneida intact. As the Court of Appeals for the Fifth Circuit recently noted, "[a]ny change in the law must therefore come from Congress, not this court." *Caravan Refrigerated Cargo, Inc., Supreme Beef Processors, Inc. v. Yaquinto,* 864 F.2d 388, 391 (5th Cir.1989).

Recognizing this, many courts in recent years have denied equitable relief for shippers who were initially quoted less than the filed rates. *See, e.g. Louisville & Nash-*

*ville R. Co. v. Mead Johnson & Co.*, 737 F.2d 683 (7th Cir.) (misquotation of rate held not a bar to later recovery of correct rate), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 320 (1984); *Fry Trucking Co. v. Shenandoah Quarry, Inc.*, 628 F.2d 1360 (D.C.Cir.1980) (carrier awarded difference between agreed upon "contract rates" and published rates); *Consolidated Freightways Corp. v. Terry Tuck, Inc.*, 612 F.2d 465 (9th Cir.) (court granted summary judgment for amount due and dismissed counterclaim for fraud), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980).

B. *The Doctrine of Primary Jurisdiction Does Not Mandate Referral to the ICC*

Despite the clarity of the filed rate doctrine, defendant has argued to this court that the doctrine should not be applied in a case in which the carrier has an unreasonable practice of negotiating certain rates, but failing to publish those rates. Defendant relies upon 49 U.S.C. § 10701(a), under which all rates charged by a motor carrier must be reasonable. Section 10701 reads in pertinent part:

Section 10701. Standards for rates, classifications, routes, rules and practices

(a) A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under Chapter 105 of this title must be reasonable. . . .

█ By casting Oneida's negotiated rate practice as "unreasonable," defendant attempts to persuade this court to defer to the ICC's "primary jurisdiction." This doctrine permits courts to refer issues of reasonableness and applicability of freight rates, charges and practices provided in tariffs to the ICC.

The doctrine of primary jurisdiction was stated by the Supreme Court in *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). In that case, the Supreme Court held that the construction of railroads' tar-iffs to determine whether shipments of incendiary bombs were subject to higher rates was an issue within the exclusive primary jurisdiction of the ICC. In making this determination, the Supreme Court enunciated the standard for determining the application of the doctrine of primary jurisdiction:

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction", on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 60 S.Ct. 325, 331, 84 L.Ed. 361.

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for existence of the doctrine are present and whether the purposes *it* serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative question. *See Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. *See Far East Conference v.*

*United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576.

352 U.S. at 63–64, 77 S.Ct. at 164–165. *See also Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976). Under the doctrine of primary jurisdiction, the district court may refer cases to the ICC to inquire into the lawfulness of a carrier's practice or to resolve problems of cost allocation that are relevant to the issue of tariff construction. *See Iowa Beef Processors v. Ill. Central Gulf & R. Co.,* 685 F.2d 255, 260–61 (8th Cir.1982).

■ In the instant case, defendant argues that Oneida's practices were unreasonable and determination of this question is subject to the ICC's primary jurisdiction. However, defendant does not specify anywhere—either in briefs or affidavits—how the *rate levels* charged by Oneida are themselves unjust and unreasonable. In fact, the affidavits submitted by defendant merely address the issue of discounts, without challenging the underlying rates. Moreover, as plaintiffs note, Janice Kelly, defendant's Director of Operations (whose affidavit was submitted by defendant), is an ICC licensed broker. As such, she has experience and knowledge regarding ICC practices and the non-negotiability of filed tariffs. Oneida's applicable tariffs were published and available. Defendant knew that if discounts were to apply to those rates, appropriate tariffs or supplements had to be filed with the ICC.

Plaintiffs provide the affidavit of R.E. Stulting, Delta Rate Traffic Auditor, to show that the legal rates were filed with the ICC at the time of shipment and that such rates had been deemed just, reasonable and lawful by the ICC prior to their taking effect. The rates were submitted by a number of rate bureaus, *prior* to their filing any general increases in rates or charges as agent for their member carriers. Under 49 C.F.R. § 1139, *Procedures in Motor Carrier Revenue Proceedings,* rate bureaus must submit, concurrently with the filing of tariffs, verified statements presenting and comprising the evidence upon which they rely to support their proposed general increases or rate restructuring. Such filings must be at least 45 days prior to the rates becoming effective to enable the ICC to evaluate the evidence properly. If the ICC, upon review of the evidentiary data submitted by the rate bureaus, finds that the rates are not justified or are unjust, unreasonable, and unlawful in any respect, the rates are not allowed to become effective. Since the rates upon which the plaintiffs seek to recover their charges have already been presented to the ICC prior to their becoming effective pursuant to 49 C.F.R. § 1139, plaintiffs argue, there is no merit to defendant's allegations that the rates are themselves unjust, unreasonable, and unlawful.

Indeed, the essence of defendant's argument is that Oneida's negotiated rate practice, not the tariffs themselves, is "unreasonable." Thus, this court's task is to determine the extent to which the applicability of filed rate doctrine might be affected by the defense that collection of an undercharge would be an unreasonable practice within the meaning of 49 U.S.C. § 10701(a). If the filed rate doctrine could be so qualified, then referral to the ICC might be appropriate.

C. *Since Equitable Defenses are Not Recognized, This Negotiated Rate Case Should Not Be Referred to the ICC.*

■ The propriety of referring negotiated rate cases to the ICC has been a matter of controversy in recent years. Historically, the ICC has not permitted shippers to raise equitable defenses to undercharge collection proceedings through its jurisdiction over unreasonable rates and practices. *See, e.g., Louisville & N.R.R. v. Maxwell, supra,* 237 U.S. at 97, 35 S.Ct. at 495. Many courts have reaffirmed this principle and declined to refer cases to the ICC. *See, e.g., McLean Trucking Company v. Allied Business Forms, Inc., (In re: McLean Trucking Co.),* 1988 Fed.Carr.Cas. (CCH) para. 87,378 (Bankr.W.D.N.C.1988); *Feldspar Trucking Co. v. Greater Atlanta Shippers Ass'n, Inc.,* 683 F.Supp. 1375 (N.D.Ga.1987); *Louisville & N.R.R. v. Mead Johnson & Co.,* 737 F.2d 683 (7th

Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 320 (1984). In the recent decision, *Delta Traffic Service, Inc. v. E.L. Mustee & Sons*, C.A. No. C87–1726 (N.D.Ohio May 12, 1988) (1988 WESTLAW 156135) (1988 U.S. Dist. LEXIS 13539), Judge Ann Aldrich heard a case involving facts nearly identical to those in the instant case and, in vacating a previous order of referral, stated:

> This Court is forced to conclude, however, that although it is sympathetic to Mustee's position, until Congress or at least the Sixth Circuit decides differently the Court has no choice but to enforce the published tariffs, at least where no ambiguity exists. Therefore, referral to the ICC would be a pointless exercise.

Slip op. at 4–5.

Other courts have referred negotiated rate cases to the ICC for a "reasonableness" determination. *See, e.g., Breman's Express Co. v. H & H Distributing Co*, 69 B.R. 356 (Bankr.W.D.Pa.1987) (court referred matter to ICC, noting that the "undercharge fraud" that has risen in the aftermath of deregulation would not be condoned by the court); *Delta Traffic Services, Inc. v. Geo. A. Hormel & Co.*, No. 87–27A, slip op. at 2 (N.D.Ga. May 19, 1987) (1987 WESTLAW 48215); *Delta Traffic Services, Inc. v. Commercial Cold Storage, Inc.*, No. C86–2132A, slip op. at 7 (N.D.Ga. March 23, 1987); *G.M.W., Inc. v. Flambeau Paper Corp.*, 623 F.Supp. 473, 475 (D.C.Wis.1985). Many of these referring courts, however, recognizing that the filed rate doctrine does not bend for equitable defenses, have not waived payment of undercharges despite an ICC determination of unreasonableness. *See, e.g., INF, Ltd. v. Spectro Alloys Corp.*, 690 F.Supp. 808 (D.Minn.1988) (court remained bound by the filed rate doctrine despite an ICC finding of unreasonableness); *In re Robinson Truck Lines, Inc., Debtor*, 89 B.R. 584 (Bankr.N.D.Miss.1988) (rejecting advisory opinions of the ICC in three referred cases). *But see In re Breman's Express Company*, 92 B.R. 636 (Bankr.W.D.Pa. 1988) (upholding ICC determination of unreasonableness); *Seaboard System R.R., Inc. v. United States*, 794 F.2d 635 (11th Cir.1986) (upholding an ICC decision ordering waiver of undercharges based on a rail carrier's ambiguous rate).

The defendant here argues that the court should relax the filed rate doctrine and refer this matter to the ICC. Defendant contends that this is the proper course, particularly in light of the ICC's 1986 announcement that it would in some circumstances use its unreasonable practice jurisdiction under 49 U.S.C. § 10701(a) to recommend equitable relief against what would otherwise be an automatically mandated collection of undercharges in the motor carrier context. *See National Industrial Transportation League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates: Ex Parte No. MC–177*, 1986 Fed.Carr.Cas. (CCH) par. 37,-284 at 47,348 (1986) ("MC–177"). The ICC's new position in MC–177 was based on its conclusion that the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 *et seq.* "dramatically altered the competitive atmosphere of the motor carrier industry." 1986 Fed.Carr.Cas. at 47,351. As a result of the "intense, new competition" leading to widespread daily negotiation of rates, the ICC believed that a new approach was needed to formulate a regulatory response to the increasingly common practice of a negotiated but unfiled rates being used. The ICC concluded that "in particular circumstances it would be fundamentally unfair not to consider a shipper's equitable defenses to a claim for undercharges.... [T]he filed rate doctrine was not intended to condone or reward carriers ... where carrier actions may constitute fraudulent business practices." 1986 Fed.Carr.Cas. at 47,350.

Moreover, defendant argues that the ICC's Rulemaking Proceeding in *National Industrial Transportation League—Petition for a Declaratory Order on Motor Common Carrier Negotiated Rates: MC–C–30090*, (1988 MCC LEXIS 226, April 14, 1988) should influence this court. The National Industrial Transportation League ("NITL") has requested that the ICC issue a declaratory order finding that it is an unreasonable practice and thus a violation

of the Interstate Commerce Act for a motor common carrier to conduct business on the basis of a negotiated and agreed rate while failing to publish the rate in an effective tariff on file at the ICC. NITL filed this petition based on its concern that courts had (1) misconstrued the force and effect of a Commission finding of unreasonableness, and (2) viewed a Commission finding of unreasonableness as a finding in "equity" rather than law (and thus not available as a defense to an undercharge claim under the filed rate doctrine). NITL urged the ICC to "assert" its jurisdiction over the reasonableness issue and to make its finding binding on the courts. The ICC granted the petition on April 14, 1988 and accepted comments through June 9, 1988 (later changed to July 25, 1988). The ICC, apparently questioning its authority to assert jurisdiction in this area, specifically requested comments "on whether the Commission has jurisdiction to issue the order proposed, under the Interstate Commerce Act, and whether such an order, if appropriate, would be effective in achieving envisioned savings in administrative and judicial costs." MC–C–30090, slip op. at 3.

Plaintiffs deny that the ICC can unilaterally "assert" its jurisdiction or that a finding of unreasonableness would change the statutory imperative to charge the filed rate. Moreover, they stress that the doctrine of primary jurisdiction is not applicable in this area. In *Nader v. Allegheny Airlines*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), for example, the Supreme Court held that questions of misrepresentations do not come within the doctrine of primary jurisdiction. The Court stated:

> Referral of the misrepresentation issue to the Board cannot be justified by the interest in informing the court's ultimate decision with "the expert and specialized knowledge," *United States v. Western Pacific R. Co., supra,* [352 U.S.] at 64, 1 L.Ed.2d 126, 77 S.Ct. 161, of the Board. The action brought by petitioner does not turn on a determination of the reasonableness of a challenged practice—a determination of the reasonableness that could be facilitated by an informed evaluation of the economics or technology of the regulated industry. The standards to be applied in an action for fraudulent misrepresentations are within the conventional competence of the courts and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of this case.

*Id.* 426 U.S. at 305, 96 S.Ct. at 1987 (footnotes omitted). *See also ICC v. J.B. Montgomery, Inc.,* 483 F.Supp. 279, 281 (D.Colo. 1980) ("In this case, the primary issue is not the reasonableness of the rates as filed with the ICC, but whether the defendants have been operating in violation of those rates. While the former question clearly does involve the expertise of the ICC, the latter does not.").

This court is not persuaded to defer to the ICC's primary jurisdiction by defendant's reference to the ICC's efforts in MC–177 and MC–C–30090. Despite the ICC's conclusion in MC–177 that it could extend its unreasonable practice jurisdiction into this new domain, it also recognized that its authority with respect to equitable defenses was limited. 1986 Fed. Carr.Cas. at 47,350. Thus, the ICC acknowledged that it lacked initial jurisdiction to entertain challenges to rates charged in the past or to order a waiver of undercharges; rather, it defined its role as limited to providing courts, upon referral and at their request, with an advisory opinion on whether the shipper should be entitled to assert equitable defenses to the collection of undercharges. 1986 Fed.Carr. Cas. at 47,352.

Moreover, if the ICC nonetheless issues a decision in MC–C–30090 in which it re-assesses its jurisdiction, it would simply be attempting to alter the clear and unqualified statutory mandate of the filed rate doctrine, which Congress left intact when it revised the relevant statute in 1980. As a matter of public policy, there may be compelling reasons to modify the filed rate doctrine. Such a decision, however, must be made by Congress and the President in

revising the applicable statute, rather than by this court or the ICC.[2]

In finding that neither MC–177, nor the Motor Carrier Act of 1980, nor any judicial precedent, has changed the statutory mandate of the filed rate doctrine, this court is concurring with several recent, relevant decisions. For example, in *Delta Traffic Service, Inc. v. Georgia–Pacific Corp.*, 684 F.Supp. 769 (D.Conn.1987), the court concluded that equitable defenses, such as the defense asserted here by Transtop, are "statutorily barred." *Id.* at 770. As the court explained, adherence to the filed rate doctrine has been consistently required regardless of the defense sought to be interposed. Further, as the court noted, when Congress rewrote the statutes governing interstate motor carriers in 1980, it neither explicitly nor implicitly amended the law requiring strict adherence to the filed rate doctrine. As the court said, while the ICC is "free to change its policies, [it] is not free to change a clearly established rule of law." *Id.* at 771. *See also West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chemical Co.*, slip op. at 6, 1987 WEST-LAW 46871 (in a case comparable to the instant case, MC–177 does not alter the power of the courts: "... these efforts to refer matters to the ICC must be reviewed in light of the fact that the ICC does not have the power to reject effective tariffs, nor the authority to order the waiver of undercharges.") (citation omitted).

More importantly, the inviolability of the filed rate doctrine was recently reaffirmed by the Supreme Court in *Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). In *Square D*, the Supreme Court revisited the filed rate doctrine in an antitrust context and concluded that the 1980 Motor Carrier Act did not alter the statutory requirements and consequences of the doctrine. In that case, the Court quoted with approval from *Keogh v. Chicago & Northwestern R. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), stating:

> The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carrier and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

476 U.S. at 416–17, 106 S.Ct. at 1926–27. *See also In the Matter of Caravan Refrigerated Cargo*, 864 F.2d 388 (5th Cir.1989) (noting that the Motor Carrier Act of 1980 did not abrogate the filed rate doctrine but left it intact; that an advisory opinion under MC–177 has no binding effect on the court; and that *Square D* shows the Supreme Court's decision not to tamper with the filed rate doctrine).

## III.  CONCLUSION

A defense of unreasonableness in a negotiated rate situation requires neither referral to the ICC, nor judicial recognition of an equitable defense. Rather, parties may not enter into a valid contract for transportation at a rate lower than that contained in the then published tariff. This conclusion is not qualified or altered by allegations of estoppel, misquotation or fraud of the carrier. Unless and until the statutory basis of the filed rate doctrine is modified, a shipper such as Transtop is obligated to compensate a carrier at the filed tariff rates.

## IV.  ORDER

For the foregoing reasons, plaintiffs' motion for summary judgment is hereby GRANTED. Defendant's motions are hereby DENIED.

■ Accordingly, defendant is hereby ORDERED to compensate plaintiffs on the

---

**2.** Although the ICC has not yet attempted to "assert" its jurisdiction in this area, and this court probably would not be persuaded by such an assertion, it should be recognized that even if such an assertion were made, a finding of unreasonableness and an ensuing equitable defense would only be appropriate in certain situations. The court questions whether equitable relief would, in any event, be appropriate in this case, where defendant was an experienced freight broker, licensed by the ICC, and aware of the carrier's duty to charge, and the shipper's duty to pay, the filed tariff.

claim for undercharges in the amount of $53,701.82, and to pay prejudgment interest on this amount. *Inman Freight Systems, Inc. v. Olin Corp.*, 807 F.2d 117, 121 (8th Cir.1986). Interest is to be calculated from the date of the original freight bills, at a rate equal to the average yield, at that date, of marketable securities of the United States government having a duration of 90 days. *Southern Pacific Transportation Co. v. San Antonio*, 748 F.2d 266, 275–76 (5th Cir.1984), *Delta Traffic Service, Inc. v. Appco Paper & Plastics Corp.*, No. CV–87–2325 (E.D.N.Y. Nov. 2, 1988) (1988 WESTLAW 127528).

Judgment in accordance with this Order shall enter forthwith.